**UTRAD CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 71–1025.**

United States Court of Appeals, Seventh Circuit.

Dec. 23, 1971.

Rehearing Denied Feb. 1, 1972.

Pell, Circuit Judge, concurred and filed opinion.

**521**

M. J. Diederich, Beverly Hills, Cal., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael Barkow, Atty., N. L. R. B., Washington, D. C., Eugene G. Goslee, Acting Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., N. L. R. B., for respondent.

Before FAIRCHILD, PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This is a petition to review and set aside an order of the NLRB issued August 27, 1970. The Board has cross-applied for enforcement of the order, which is reported at 185 NLRB No. 49.

Petitioner Utrad Corporation (Company) manufactures electronic transformers and related products at its plant in Huntington, Indiana. In 1964 the International Union of Electrical, Radio and Machine Workers (IUE) attempted to organize the Company's employees. To combat the union's campaign, Company officials suggested that its employees form a club to handle grievances. Company President Kaufman helped organize the "Utrad Employees Association," assisted it in election of its officers and arranged for the Association to receive part of the profits from the plant's vending machines. Subsequently, the Company negotiated with the Association and modified several of its policies regarding wages and hours.

The IUE filed a charge with the NLRB alleging that the Company had

violated Section 8(a) (2) [1] by assisting and dominating the Association. In April 1964 the Company and the IUE, with Board approval, signed a settlement agreement in which the Company promised to disestablish the Association as a bargaining representative. For the next five years the Association performed only social and recreational functions; Utrad employees had no bargaining representative.

I

In late April 1969 the International Union of District 50, Allied and Technical Workers (Union) began an organizing campaign. In May the Association's president, Kenneth Grimes, a Company supervisor, with other Association officers decided to revitalize the Association by electing departmental representatives. Foremen distributed slips of paper to employees during working time. Employees were told that their new representatives would convey complaints and requests to the management. New officers were elected in June, through use of Company time, bulletin boards and mimeograph services.

The new officers met with Company President Clark during working hours in June to get his approval for recreational activities during lunchtime and for the use of the cafeteria for meetings of Association officers.

An NLRB election was held on July 18, 1969, in which 74 votes were cast for District 50, 36 for another union and 308 for no union. Shortly after the election, Company President Clark met with Association officers and asked that departmental representatives collect suggestions from employees and present them to management officials. In early August he met with Association offi-

cers; they went through the employee handbook page by page to discuss proposed changes. Sometime in September the Company distributed to all employees revised pages of the handbook. Changes had been made in policies regarding insurance, tardiness, holiday and vacation pay, wage reviews and absenteeism.

Throughout the period of April to September, the Association continued to include supervisors in its membership, to conduct meetings on Company premises during working hours and to receive vending-machine profits (about $3,000 a year) as its sole source of financial support.

Following the Union's complaint of unfair labor practices, the Board's General Counsel instituted proceedings against the Company and withdrew approval of the 1964 settlement agreement.

We find substantial evidence in the record to support the Board's conclusion that the Company "has assisted, contributed support to, and dominated the Association while functioning as a labor organization within the meaning of and in violation of Section 8(a) (2) and (1) of the Act."

The Company cites a number of cases in which courts have refused to find a violation of Section 8(a) (2).[2] These cases are easily distinguishable because of the absence of a history of antiunion bias or of other unfair labor practices, or because of the Board's reliance on a single form of support or domination in finding a violation. As this court said in NLRB v. Thompson Ramo Wooldridge, Inc., 305 F.2d 807, 810 (7th Cir. 1962): "The question is not whether each individual fact is a violation, but whether the facts taken together justified the Board's conclusion."

---

1. 29 U.S.C. § 158(a): "It shall be an unfair labor practice for an employer— . . . (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it. . . ."

2. *Lake City Foundry Co. v. NLRB*, 432 F.2d 1162 (7th Cir. 1970); *Boyle's*

*Famous Corned Beef Co. v. NLRB*, 400 F.2d 154 (8th Cir. 1968); *NLRB v. Coca-Cola Bottling Co.*, 333 F.2d 181 (7th Cir. 1964); *NLRB v. Magic Slacks, Inc.*, 314 F.2d 844 (7th Cir. 1963); *NLRB v. Post Publishing Co.*, 311 F.2d 565 (7th Cir. 1962).

Taken together, the facts here—anti-union history; Company supervision of the formation of the Association; Company assistance via money, time, space, supplies and services; participation of supervisory personnel; revitalization of the Association contemporaneously with the Union campaign; and fruitful bargaining sessions between management and employee representatives—add up to an unmistakable picture of Company support of the Utrad Employees Association. In similar instances the courts have not hesitated to enforce the Board's orders. International Association of Machinists, Tool and Die Makers Lodge No. 35 v. NLRB, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940); NLRB v. Ampex Corp., 442 F.2d 82 (7th Cir.), cert. denied, 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 (1971); NLRB v. Thompson Ramo Wooldridge, Inc., 305 F.2d 807 (7th Cir. 1962); NLRB v. Oliver Machinery Corp., 210 F.2d 946 (6th Cir. 1954).

The Company argues that the Association is not a "labor organization"[3] because its purpose is to perform social functions, not to deal with the employer. This argument asks us to narrow the customarily broad interpretation of the terms "labor organization" and "dealing with." NLRB v. Cabot Carbon Co., 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959); NLRB v. Thompson Ramo Wooldridge, Inc., 305 F.2d 807 (7th Cir. 1962). It also asks us to ignore the bargaining sessions during the summer of 1969 as a "single incident" of no significance. This the record will not permit us to do.

## II

During the Union's organizing campaign, the employee handbook contained Rule 21, "Employee soliciting will not be allowed unless approved by the Personnel Department." As the trial examiner found, the rule was broad enough to be presumptively violative of Section 8(a) (1).[4] There was no evidence, however, that the rule was ever enforced. The Company issued a new Rule 21, "Employee soliciting during work time will not be allowed," by passing out a revised page of the handbook in October 1969, about a week before the first NLRB hearing. Because the old rule was not enforced and the new rule is presumptively valid,[5] the trial examiner found that the old rule had not been maintained in effect in violation of Section 8(a) (1).

The Board reversed by a 2–1 vote. The majority seems to have based its ruling in part on a misunderstanding of the record. The Board's decision states that the old Rule 21 was republished in September when other revisions in the handbook were made. But the record is clear that only selected pages of the handbook were republished; the page on which Rule 21 appears was not republished until it was revised in October. Nevertheless, we believe that the Company's failure to revise the old rule when other revisions were made (several months after the NLRB's complaint had called attention to its invalidity) constituted maintenance of the rule in violation of Section 8(a) (1). Because "the mere existence of a broad no-solicitation

3. 29 U.S.C. § 152(5): "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

4. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); P. R. Mallory & Co. v. NLRB, 389 F.2d 704, 709 (7th Cir. 1967). 29 U.S.C. § 158(a) reads: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title. . . . "

5. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803–804 n. 10, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

rule may chill the exercise of the employees' § 7 rights," [6] the Company cannot limit the Board's cease-and-desist power by revising an overbroad rule. Mason & Hanger—Silas Mason Co. v. NLRB, 405 F.2d 1, 4 (5th Cir. 1968).

The Company cites Mallory Battery Co., 176 NLRB No. 108 (1969), to argue that a good-faith revision of an invalid rule protects an employer from an NLRB order. But the Mallory rule was revised immediately after a field examiner informed the company that its rule violated Section 8(a) (1). The employer stopped giving out copies of its handbook and put up new posters explaining company rules. Utrad's response was neither so quick nor so effective in promulgating a new rule.

Requiring the Company to post a notice regarding the change in its solicitation rule will carry more impact in informing employees of their rights than merely passing out a revised handbook page. The Company should not object to this opportunity to make its position clear. See Peter J. Schweitzer, Inc. v. NLRB, 79 U.S.App.D.C. 178, 144 F.2d 520, 522 (1944).

### III

During the Union campaign, several conversations occurred between employees and supervisory personnel; the Board held that these conversations constituted coercion in violation of Section 8(a) (1).

Foreman Dillon asked Deitch, an employee, his views on the Union. Deitch declined to discuss the matter on Company time.

Dillon also asked Employee Gordon what he thought about the Union. In the first two conversations, Gordon responded that he supported the Union. In the third conversation he replied, "Well, I'll just have to wait and tell you later after the election." On the day of the election Gordon again verified his support for the Union. Despite denials by Dillon, the trial examiner credited Gordon's testimony that Dillon then said, "You'd better give it some serious thought because if the union gets in the Company will close the place down, they wouldn't tolerate a union, they wouldn't have a union." Gordon did not believe Dillon and voted for the Union.

Foreman Lawson and Plant Manager Pinegor on separate occasions asked Cynthia Garrison, a Union supporter, why she wanted a union. Garrison, who customarily wore a sweatshirt marked with Union slogans, replied that she had certain "gripes" against the Company.

■ The Company argues that the Board erred in attributing to management Dillon's threat about closing the plant. The threat is similar to one made by a foreman in NLRB v. General Industries Electronics Co., 401 F.2d 297 (8th Cir. 1968). There the court found that the isolated statement, made without the knowledge or encouragement of management, could not support a finding of coercion by the employer. In the instant case there was no evidence that the employee could have believed Dillon, a low-level supervisor, had authority to speak for the Company. We hold that the Board should not have considered this single, isolated statement in determining whether the Company had coerced its employees.

Excluding the plant-closing threat, the other conversations pale into insignificance. They involved only three employees out of 455. They occurred in the employees' work areas between persons in daily contact and were casual and friendly. There was no hint of reprisal for Union support.

■■ Only one of the indicia used in Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964), to identify coercive interrogations is present: a history of employer hostility and discrimination. But an interrogation not coercive in itself "does not become coercive because the employer is guilty of other unfair practices." NLRB v. Dorn's Transportation Co., 405

---

6. NLRB v. Beverage-Air Co., 402 F.2d 411, 419 (4th Cir. 1968).

F.2d 706, 714 (2d Cir. 1969). For a nonthreatening conversation to violate Section 8(a) (1), there must be circumstances which would reasonably induce fear of reprisal. NLRB v. McCormick Steel Co., 381 F.2d 88 (5th Cir. 1967). We find no circumstances in this case to support a finding that the interrogations produced fear in any of the three employees. The conversations were not coercive within the meaning of Section 8(a) (1). We therefore refuse to enforce Paragraphs 1(b) and (c) of the Board's order. The first two paragraphs of the "Notice to Employees" should be deleted.

Enforced as modified.

PELL, Circuit Judge (concurring).

I approve of and concur in Judge Sprecher's opinion. However, I do so, insofar as approving the final paragraph of the "Notice to Employees" is concerned, on the basis that this paragraph as I construe it is necessarily limited to what it plainly states.

As a result of the opinion the six paragraphs of the "Notice" are now pared to four. The final paragraph reads as follows:

> "We Will Not in any like or related manner interfere with, restrain, or coerce our employees in the exercise of their right to self-organization, to form, join or assist any labor organization, to bargain collectively through representatives of their own choosing, to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection."

On first reading, the reach of this paragraph would seem to be substantially beyond what would reasonably be indicated by the quite minimal antiunion history of the Company. Even though the Company took no exception to the breadth of the "Notice," I do not find a basis for saddling an employer with an unmerited order.

However, on further examination of the paragraph in question, it appears to me that it is controlled by the key words of limitation, "in any like or related manner" and thereby confined in its scope to the three previous paragraphs dealing with restraint activities "like or related to" the prohibited employees' association and the solicitation rule.