# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-60124

United States Court of Appeals
Fifth Circuit

**FILED**
December 20, 2016

Lyle W. Cayce
Clerk

UNF WEST, INCORPORATED,

Petitioner Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent Cross-Petitioner

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

Before STEWART, Chief Judge, and SMITH and DENNIS, Circuit Judges.

CARL E. STEWART, Chief Judge:

UNF West, Inc. ("UNF") petitions for review of a National Labor Relations Board ("Board") Decision and Order finding that UNF engaged in unfair labor practices by (1) interrogating employees about their union activities, (2) threatening employees with futility regarding their rights to organize and bargain collectively, and (3) threatening employees with reduction of wages. The Board cross-applies for enforcement of its Order. UNF's petition is DENIED; the Board's cross-application is GRANTED.

## I.    Background

UNF is a California corporation involved in distributing natural and organic foods. It maintains a facility in Moreno Valley, California. The

No. 16-60124

International Brotherhood of Teamsters, Local 166 ("Union") began an organizing campaign at the Moreno Valley facility in 2012. That same year the Board conducted a representation election, which the Union lost. The Union subsequently filed objections based on alleged unfair labor practices, asking for the result to be set aside. The Regional Director found merit in the Union's claims, and the matter was heard before an Administrative Law Judge ("ALJ"). However, before the ALJ ruled, the Union withdrew its objections to the election and sought again to be elected as the employees' representative. The ALJ eventually rendered his decision, which the Board adopted and the D.C. Circuit enforced in *UNF West, Inc. I*, 361 NLRB No. 42 (2014). Meanwhile, the Board set a new election date for late May, but canceled that election the night before due to fresh allegations of unfair labor practices on the part of Juan Negroni ("Negroni") and Carlos Ortiz ("Ortiz"), Kulture labor consultants who acted as UNF's agents. [1]

After a hearing, a second ALJ found the conduct of these consultants to have violated Section 8(a)(1) of the National Labor Relations Act ("NLRA") insofar as it involved (1) engaging in coercive interrogation with and making threats of futility to employee Armando Perez Aceves ("Aceves"), (2) doing the same with respect to employee Lino Contreras ("Contreras"), and (3) threatening a group of employees with the possibility of a reduction in wages. According to testimony presented at the hearing, the culpable conduct occurred on three separate occasions.

First, on May 9, 2014, Aceves attended a meeting with Ortiz, at which Negroni was also present. Aceves was an open union supporter, but the ALJ

---

[1] Although not specifically stated in the record, it appears from the context of the references in the witnesses' testimony, the ALJ's decision, and the parties' briefs that "Kulture" refers to Kulture Consulting, LLC—an organization that offers consulting services in the field of labor relations.

No. 16-60124

found no evidence that this fact was known to UNF. Aceves testified that the meeting lasted about 40–50 minutes. After the meeting, Aceves testified that he returned to his work area in the warehouse. Negroni approached Aceves in the warehouse and asked him, "How are you doing? How do you feel with the Union?" Aceves replied, "Is this an interrogation? I'm working. Leave me alone. I'm working. Don't interrupt me." Negroni said, "Calm down." Aceves then showed Negroni a document entitled "Employee Rights Under the National Labor Relations Act" because, as Aceves testified, Negroni pressured employees and spoke ill of the Union. After seeing the document, Negroni said, "This document doesn't work here, my brother." He also said, "Who pays your check, the company or the Union?" Aceves then asked Negroni, "If the firemen, the policemen, have [a] union, why are you always talking bad about the Union?" Negroni stared at Aceves and then left.

With regard to the second incident, Contreras alleged that he had a conversation with Negroni in the warehouse on May 22, 2014. Negroni purportedly approached him in an aisle and asked, "What about the Union?" Negroni went on to say, "I have heard that the Union is making a lot of promises." After Contreras denied this and suggested that Negroni and his colleagues were "making false promises" and "[l]ying to people and threatening them," Negroni allegedly said "I hope the company won't hear what you're saying." In response, Contreras showed him the same document that Aceves had shown Negroni two weeks prior, which prompted Negroni to admonish that the document was "useless," as "[t]he company ha[d] its own policies."

As to the third incident, on May 16, 2014, UNF called Contreras to attend an employee meeting in the human resources department at which Ortiz gave a slide presentation. Contreras testified that Ortiz began the meeting by speaking ill of the Union, whereupon Contreras interjected with the following: "I have heard from the warehouse that you guys are saying that if the Union

wins, the Company's going to reduce the wages of all the employees." Ortiz responded, "Lino, we put that message on the projector so everybody could see it. Lino, of course, if the Union wins, the Company could reduce your wages." Contreras responded, "But that's illegal." Ortiz responded again, "Lino, who pays your salary? The Company, right? Therefore, the Company has the right to reduce your salary." Employee Juan Urquiza, also present at the meeting, corroborated this version of events, testifying that in response to questioning by Contreras, Ortiz said, "If the Union won and they would represent [you] , . . the company could lower [your] wages, salaries . . . because the company pays [your] salaries."

The Board considered and affirmed the ALJ's rulings and adopted his recommended Order. UNF then filed the instant petition with this court.

## II.     Standard of Review

We will affirm the Board's findings of fact if they are "supported by substantial evidence on the record, considered as a whole." *Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 476 (5th Cir. 2001). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012) (emphasis omitted) (quoting *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993)). Although the reviewing court is "obligated to consider evidence that detracts from the Board's finding," *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996), the ALJ's decision stands "if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion had the matter been presented to it in the first instance." *Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1314 (5th Cir. 1988). The ALJ's credibility choices bind this court "unless one of the following factors exists: (1) the credibility choice is unreasonable, (2) the choice contradicts other findings,

No. 16-60124

(3) the choice is based upon inadequate reasons or no reason, or (4) the ALJ failed to justify his choice." *Asarco*, 86 F.3d at 1406.

Challenges to legal conclusions are reviewed *de novo*, *id.*, while procedural and evidentiary rulings are reviewed for abuse of discretion. *Marathon LeTourneau Co., Longview Div. v. NLRB*, 699 F.2d 248, 254 (5th Cir. 1983).

### III.    Discussion

The NLRA functions to regulate conduct attending organizational activities in the workplace in a manner that balances between protecting the rights of employees, employers, and "to a lesser extent, . . . the union."[2] Section 7 of the NLRA grants employees a wide range of rights to organize themselves, to "form join, or assist labor organizations," to engage in collective bargaining via their chosen representatives, "to engage in concerted activities" to further collective bargaining or "other mutual aid or protection," or to refrain from these activities. 29 U.S.C. § 157 (2015). Section 8(a)(1) functions to protect employees in the exercise of these rights, and it outlaws as "unfair labor practices" any employer activities that "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]." 29 U.S.C. § 158 (a)(1). In this case, the alleged unfair labor practices take the form of (1) a threat to reduce wages, (2) threats of futility regarding exercise of Section 7 rights, and (3) coercive interrogation of employees.

*A. Threats to Reduce Wages*

The ALJ determined (1) that Ortiz's statement—that UNF could reduce employees' wages because it pays those wages—came before the slide presentation and included no mention of collective bargaining, and (2) that even if the later slide presentation referenced collective bargaining, the earlier

---

[2] 1 ABA SECTION OF LABOR & EMPLOYMENT LAW, THE DEVELOPING LABOR LAW 81 (John E. Higgins, Jr., et al. eds., 6th ed. 2012).

statement without that reference was never specifically corrected. Accordingly, Ortiz's statement could be reasonably interpreted as conveying a threat that UNF would unilaterally reduce wages should the Union win the election.

On appeal, UNF contends that because (1) the slide presentation began by defining collective bargaining as the subject of the meeting and (2) Ortiz read slides describing collective bargaining in an objective manner and specifically disclaimed authority to make threats, the slides should establish that Ortiz's statements were made in the context of collective bargaining.

The alleged threats to reduce wages at the May 16, 2014 meeting violate Section 8(a)(1) "if, under the totality of the circumstances, 'the employees could [have] reasonably conclude[d] that the employer [was] threatening economic reprisals if they support[ed] the Union.'" *TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 418 (5th Cir. 1981) (quoting *Hendrix Mfg. Co. v. NLRB,* 321 F.2d 100, 105 (5th Cir. 1963)). Employers are "free only to tell 'what [they] reasonably believe[ ] will be the likely economic consequences of unionization that are outside [their] control,' and not 'threats of economic reprisal to be taken solely on [their] own volition.'" *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 619 (1969) (quoting *NLRB v. River Togs, Inc.*, 382 F.2d 198, 202 (2d Cir. 1967)). Although employers can communicate "general views about unionism" or "specific views about a particular union," *TRW, Inc. v. NLRB*, 654 F.2d 307, 313 (5th Cir. 1981), statements that carry "any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him," are considered impermissible threats of retaliation. *Gissel*, 395 U.S. at 618.

Cases applying this rule to statements regarding reductions in wages or benefits have found that such a statement is *not* a threat of reprisal where it "was made in a context . . . indicat[ing] . . . that bargaining is a process in which each side makes its own proposals, that it requires mutual agreement, and

where existing benefits may be traded away." *Histacount Corp.*, 278 NLRB 681, 689 (1986). But if the statement in its context "fail[s] to include any reference to the collective-bargaining process or to any economic necessities or other objective facts as a basis for its prediction that wages might be reduced," then it is impermissible, because it implies that an employer may act on its own initiative, unilaterally, and for its own reasons. *President Riverboat Casinos of Mo., Inc.*, 329 NLRB 77, 77 (1999).

We agree with the Board and the ALJ that Ortiz's statements constitute a threat to reduce wages in violation of Section 8(a)(1). Our review of the record evidence shows that the context existing contemporaneously with or immediately prior to Ortiz's statements was devoid of reference to the give and take of collective bargaining. This is because the only statements objectively characterizing collective bargaining began at the second slide of the presentation, and according to testimony credited by the ALJ, Ortiz's problematic statements were made before he began reading the slides. In the absence of prior or contemporaneous context indicating that collective bargaining is a give-and-take process, Ortiz's admonition that "of course, if the Union wins, the Company could reduce your wages," along with "Lino, who pays your salary? . . . The Company, right? Therefore, the Company has the right to reduce your salary" reasonably implied that UNF could *unilaterally* lower wages for any reason it chose. *See id.* at 77; *Gissel*, 395 U.S. at 618.

Second, Ortiz's later statements, which consisted of his reading the slide presentation text word for word, did not even address the earlier implication that UNF could unilaterally reduce wages. While only contemporaneous or earlier contextual factors can influence a statement's reasonable import for the listener at the time that the statement was uttered, *see TRW*, 654 F.2d at 313 (noting that "language used by the parties involved in a union representation campaign . . . must be considered *in light of the circumstances existing when*

No. 16-60124

*such language was spoken*" (emphasis added)), additional comments can be made to clarify, expand, or otherwise alter the context and reasonable import of that statement. *See Plastronics, Inc.*, 233 NLRB 155, 156 (1977) (noting that "statements are not objectionable when additional communication to the employees" establishes that reductions in wages will come only as a result of "the normal give and take of collective bargaining," thus dispelling any misimpressions). However, any remedial statements must be, *inter alia*, specific in nature to the coercive conduct. *Passavant Mem'l Area Hosp.*, 237 NLRB 138, 138 (1978); *accord Teksid Aluminum Foundry, Inc.,* 311 NLRB 711, 711 n.2 (1993). In this case, the content of the slides that Ortiz read—stating that "bargaining starts from where you are now and you can gain, stay the same, or you can lose," and that "as a result of bargaining, you may end up with more than you have today, the same as you have today, or less than you have today"—fails to specifically address the earlier implication that UNF could unilaterally lower wages if the Union carried the election. Accordingly, we conclude that the ALJ's holding is not in error.[3] *Asarco*, 86 F.3d at 1406.

*B. Threats of Futility*

The ALJ found that Negroni's May 9th statement in relation to the document listing employee rights that Aceves handed to him "doesn't work here" clearly conveyed that Section 7 rights, "including the right to form a union, did not apply to [UNF] and it was therefore useless for Aceves to attempt to organize with his coworkers and . . . join the Union." The ALJ also

---

[3] UNF also argues that Ortiz's use of "could"—as opposed to "would"—in reference to wage reduction establishes the permissibility of his statements. We find this view unpersuasive. Telling employees that UNF *could* choose to lower wages at its option—i.e., regardless of Union exception—no more objectively and accurately represents the give and take of collective bargaining negotiations than would a more direct statement of UNF's unilateral intention to reduce wages in the event of unionization. *See President Riverboat Casinos of Mo.,* 329 NLRB 77, 77 (1999).

found that Negroni's May 22nd statement to Contreras that the document detailing employee rights was "useless" because "[t]he Company has its own policies" communicated the same message.

On petition for review, UNF argues principally that neither of the statements that the ALJ found to be threats of futility was accompanied by a threat to take action to *ensure* futility, and so they do not run afoul of Section 8(a)(1) under this court's precedent. We disagree.

Threats of futility include "remarks concerning the futility of electing a union," *NLRB v. Laredo Coca Cola Bottling Co.*, 613 F.2d 1338, 1341 (5th Cir. 1980), or those that communicate a message to "employees that selection of a union would be an 'exercise in futility.'"[4] While the Board proscribes such remarks where they "were clearly intended to and had the effect of conveying to the employees the futility of their support of the Union," *Wellstream Corp.*, 313 NLRB 698, 706 (1994), "this Court has only found comments to be unlawful statements about futility when *accompanied* by a threat or implication that the employer will take some action to render union support futile." *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634 (5th Cir. 2003) (emphasis added). Accordingly, we review the record for affirmative evidence that (1) remarks were made concerning the futility of exercising unionization rights and (2) those remarks were conjoined with a threat or implication that UNF would act to ensure the futility of union organization. *See Brown & Root, Inc.*, 333 F.3d at 634.

Because our review reveals such evidence, we agree with the Board and the ALJ that Negroni's statements constituted threats of futility in violation of Section 8(a)(1). Regarding the conversation with Aceves, a UNF

---

[4] DEVELOPING LABOR LAW, *supra* note 2, at 150; *see also NLRB v. Varo, Inc.*, 425 F.2d 293, 299 (5th Cir. 1970).

representative's remark that "this document doesn't work here" in reference to a document detailing *inter alia*, employee rights to (1) organize; (2) form, join, or assist a Union; (3) bargain collectively; (4) discuss wages and benefits; and (5) improve working conditions, suggests that such rights are not enforceable by employees of UNF. This statement thus communicates the futility of exercising these rights. *See Wellstream*, 313 NLRB at 706. Moreover, Negroni's reminder of who pays Aceves's check constitutes a threat or implication that UNF could take some action to ensure the futility of unionization. The reference to Aceves's check highlights Aceves's economic dependence on his employer, and tells Aceves that the employer is in sole control of the results and achievements of unionization. Combined with the earlier statement regarding the disutility of the employee rights document, this paycheck reference can be reasonably understood to mean that UNF could take action to ensure futility by lowering wages, by firing employees, or by disregarding employee rights—including their rights to bargain and discuss wages.

Regarding Contreras, Negroni's comments that the employee rights document in Contreras's possession (the same document Aceves showed Negroni) was "useless" because "[t]he company has its own policies," coupled with Negroni's earlier comment that "I hope the company won't hear what you're saying" constituted a threat of futility. First, Negroni's comment on the uselessness of the employee rights document signifies that attempts to exercise employee rights are futile because UNF has its own policies. *See Wellstream*, 313 NLRB at 706. Second, the full context of Negroni's remarks establishes the presence of an accompanying threat to ensure futility. *See Brown & Root, Inc.*, 333 F.3d at 634. This conclusion depends on the aggregation of two aspects of the conversation: (1) the statement regarding UNF's policies, which signals that UNF is in full control of anything going on inside the facility; and (2) Negroni's statement prior to the remarks concerning futility, which implied

consequences for Negroni's expression of discontent with UNF's actions and so imparts information regarding UNF's disposition to punish. To join an assertion of control with a disposition to punish is to combine a threat of punishment with a statement of capability. Combine this further with a remark of futility, and the jurisprudential requirements are met.

The difficulty is the timing of the comments to be combined. The actual threat communicating disposition to punish came before the subject matter prompting the remarks of futility and before the comments asserting unilateral control. Accordingly, one might claim that these statements are disconnected, and that the threat does not *accompany* the remark of futility. However, this view would seem to ignore the requirement that threats of futility, just like other violations of Section 8(a)(1), are to be examined according to their full context. *See Whirlpool Corp.,* 337 NLRB 726, 730–31 (2002) (describing legal principles generally applicable to § 8(a)(1) violations); *Rossmore House*, 269 NLRB 1176, 1177 (1984) ("To fall within the ambit of § 8(a)(1), either the words themselves *or the context in which they are used* must suggest an element of coercion or interference."(emphasis added)). A threat communicating a disposition to punish in one part of a conversation does not simply evaporate as regards another part of the conversation transpiring mere moments later. Because the threat was already part of the context surrounding the remarks of futility, Negroni's comments to Contreras constituted a threat of futility. *See Rossmore House*, 269 NLRB at 1177; *Brown & Root, Inc.*, 333 F.3d at 634. For the above reasons, we conclude that the ALJ's holding on this issue was not in error. *Asarco,* 86 F.3d at 1406.

*C. Coercive Interrogation*

The ALJ found that both the May 9th and May 22nd conversations between Negroni and employees Aceves and Contreras, respectively,

constituted coercive interrogations. The ALJ concluded that the "entire [May 9th] conversation established" the interrogation's coerciveness because: (1) Aceves was questioned by a UNF agent charged with combatting the Union's organizing campaign shortly before an election; (2) there was no evidence that Aceves engaged in open Union activity at the workplace or that Negroni was aware of the degree of Aceves's Union involvement; (3) the conversation between Negroni and Aceves was neither casual, friendly, nor joking (Aceves told Negroni, "Leave me alone"); and (4) Negroni issued "an employer's ultimate threat, that it controlled Aceves's employment." As for the May 22nd conversation, the ALJ found that its entire context established coerciveness based on the information sought by Negroni's questioning and his statement that UNF would not want to hear what Contreras was saying, implying adverse consequences for Contreras.

UNF's primary objection to the ALJ's analysis of this issue is that it failed to apply all of the *Bourne* factors.[5] UNF asserts that some of those that were not applied would have weighed in its favor. UNF asserts that the ALJ's treatment of the factors is legal error preventing enforcement. We disagree.

Interrogation of employees is illegal when "the words themselves or the context in which they are used . . . suggest an element of coercion or interference." *Rossmore House*, 269 NLRB at 1177. The presence of such an element is ascertained by examining the totality of the circumstances, an analysis guided by the application of several factors: (1) the background, or history of employer hostility and discrimination; (2) the nature of the information the questioner seeks; (3) the rank of the questioner in the company hierarchy; (4) the place and manner of the interrogation; (5) the truthfulness of the employee's reply; (6) whether the employer had a valid purpose in

---

[5] *Bourne v. NLRB*, 332 F.2d 47, 49 (2d Cir. 1964).

obtaining the information sought about the union; (7) whether a valid purpose, if existent, was communicated to the employee; and (8) whether the employer assured the employee that no reprisals would be forthcoming should he or she support the union. *NLRB v. Brookwood Furniture*, 701 F.2d 452, 460–61 (5th Cir. 1983); *accord Paceco v. NLRB*, 601 F.2d 180, 183 (5th Cir. 1979); *TRW-United*, 637 F.2d at 416; *see also Bourne v. NLRB*, 332 F.2d 47, 49 (2d Cir. 1964).

The *Bourne* factors are analytical guiding lights—not a mandate for formalistic analysis. *See Sturgis Newport Business Forms, Inc. v. NLRB*, 563 F.2d 1252, 1256 (5th Cir. 1977) (noting that "a proper evaluation of the evidence goes beyond examining a list of factors and then comparing the number that favor the employer to the number that favor the union," since "[i]ntimidation may occur even if all factors cut in favor of the employer"). Both the NLRB and this circuit have repeatedly stressed that "[n]o single factor is determinative and 'coercive interrogation may still be found . . . even if all the above enumerated factors operate in the employer's favor.'" *Tellepsen Pipeline Servs. Co. v. NLRB,* 320 F.3d 554, 561 (5th Cir. 2003) (quoting *McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993))*; accord TRW-United*, 637 F.2d at 416 (noting that the list of factors "is not exhaustive . . . and coercion may occur even if all of these factors operate in favor of the employer"). Moreover, it is important to note that the inquiry relates to *potentiality*, and not to *actuality*—that is, "the test is whether the questioning tends to be coercive, not whether the employees are in fact coerced." *NLRB v. Varo, Inc.*, 425 F.2d, 293, 298 (5th Cir. 1970).

Our review of the record evidence indicates that the Board and ALJ properly concluded that Negroni's conduct on May 9th and May 22nd constituted coercive interrogation in violation of Section 8(a)(1). There is no requirement that an ALJ apply all the factors to every situation, and coerciveness can be

found even where no enumerated factors favor the Board. *See, e.g.*, *Tellepsen Pipeline*, 320 F.3d at 561. If not all are required, then a failure to apply them all cannot be legal error, and although it is true that the Board's opinion must provide an appellate court with a basis to determine whether these factors were applied and "evaluate the substantiality of the evidence to support each factor," *Paceco*, 601 F.2d at 183, the Board's discussion of facts relevant to the factors it did apply in this case met that requirement.

For both scenarios, the ALJ specifically mentioned the *Bourne* factors and based his decision on a number of facts relevant to them in consideration of the totality of the circumstances, including (1) the background, namely that these incidents occurred "shortly before an election"; (2) the identity of the questioner as a UNF agent "charged with combatting the Union's organizing campaign"; (3) the nature of Aceves's responses to questioning, concluding that these indicated that the conversation was not friendly or joking; (4) the place and method of the interrogation, noting that the questions Negroni asked were accompanied by a threat referencing Aceves's economic dependence. Indeed, the presence of a threat implies the absence of a free choice, and accordingly, "interrogation accompanied by threats has been held to interfere with an election even though only one percent of the employees were threatened."[6] For the reasons stated, we see no basis upon which to disturb the ALJ's finding on coerciveness.[7]

---

[6] DEVELOPING LABOR LAW, *supra* note 2, at 182; *see also Super Thrift Mkts., Inc.,* 233 NLRB 409, 409 (1977) (noting that one can reasonably expect coercive statements made to a small number of employees in election campaigns to be disseminated to others).

[7] UNF also claims that Negroni's statements to Aceves and Contreras are too ambiguous to violate the NLRA, highlighting what it perceives as a lack of evidence to support the ALJ's finding that Negroni's statements had a threatening aspect. As this contention relates to inferences drawn from the evidence as to the meaning of words in context and what meaning employees took from those words, whether statements have a threatening quality is a factual question (as opposed to whether statements violated the NLRA, which would be a legal question). *See, e.g., Louisville Chair Co.,* 146 NLRB 1380, 1381

No. 16-60124

*D. Remaining Objections*

UNF also raises three other objections to the Board and ALJ's decision, all of which we conclude to be without merit.

First, UNF objects that the Board and ALJ erred by refusing to allow Ortiz to testify in Spanish while allowing the General Counsel's witnesses to do so. Evaluations regarding the competence of a witness to testify in English and the corresponding "need for an interpreter [are] within the discretion of the [ALJ]." *Meat Packers Int'l,* 225 NLRB 294 n.8 (1978). Ortiz is fluent in English, and a significant part of his job involves translating between English and Spanish. He displayed no apparent difficulty testifying in English, and review of the transcript uncovers no evidence of his confusion or misunderstanding. Moreover, the ALJ's decision to withhold an interpreter was subject to revision if Ortiz began to display linguistic difficulty—which he did not. We conclude that the ALJ reasonably exercised his discretion in requiring Ortiz to testify in English. *See Marathon LeTourneau Co.,* 699 F.2d at 254.

Second, UNF objects that the Board and ALJ erred by ordering the extraordinary remedy of public notice reading. Because "[t]he particular means by which the effects of unfair labor practices are to be expunged are matters for the Board[,] not the courts to determine," *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 539 (1943) (quotation marks omitted), administrative remedial choices "stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies

---

(1964) (finding the record too conflicted to support treating statement that employee would "have to walk the chalk line" or "was going out" as a threat); *Bomber Bait Co. Inc.,* 210 NLRB 673, 674 (1974) (finding the record rendered statement "won't be there long enough" too ambiguous to support finding of violation). Accordingly, this court will defer to the ALJ's reasonable inferences drawn from the record if there is substantial evidence to support them. *Standard Fittings Co.*, 845 F.2d at 1314. Considering the evidence before him, the ALJ found that the statements were threatening. Based on our review of the record, we conclude that this was a reasonable inference to draw.

15

of the Act." *Id.* at 540; *accord J.P. Stevens & Co. v. NLRB,* 417 F.2d 533, 537 (5th Cir. 1969). Public notice reading in particular is designed to "ensure that the important information set forth in the notice is disseminated to all employees, including those who do not consult the [employer's] bulletin boards." *Excel Case Ready*, 334 NLRB 4, 5 (2001). This court has previously noted that "[f]or repeated violations persisted in despite intervening declarations of illegality, the Board is warranted in impliedly concluding that such conduct has created a chill atmosphere of fear and, further, in recognizing that the reading requirement is an effective but moderate way to let in a warming wind of information and, more important, reassurance." *J.P. Stevens & Co.*, 417 F.2d at 540.

It is incontrovertible that UNF is a repeat violator of Section 8(a)(1). In 2014, in the same Moreno Valley facility, an ALJ found UNF to have (1) made threats of futility, (2) made threats to reduce benefits, and (3) coercively interrogated employees. *UNF West, Inc. I*, 367 NLRB at *2. The instant case thus represents the second round of the same problematic conduct in the same facility, in the context of the same unionization campaign—only with new characters. Accordingly, the Board's choice of remedy was not a patent attempt to extend itself beyond the policies of the Act. *See Va. Elec. & Power Co.,* 319 U.S. at 540.

Finally, UNF objects that the Board and ALJ erred by refusing to allow it to present testimony that established that there was a petition to ask the Union to withdraw, that proffered witnesses had signed the petition, and that those witnesses had never heard Ortiz or Negroni make any of the allegedly problematic statements to Aceves or Contreras or to them individually. The ALJ enjoys wide discretion to exclude irrelevant or otherwise inadmissible evidence. *See Marathon LeTourneau Co.,* 699 F.2d at 254. The Board conducts its proceedings in accordance with the Federal Rules of Evidence, so far as

possible. *Id.* at 253. Under the Rules, evidence is relevant only if it has a tendency to make a fact of consequence more or less probable. Fed. R. Evid. 401. Additionally, testimony is admissible only where there is evidence to show the witness has personal knowledge of the matter to which she testifies. Fed. R. Evid. 602.

Neither the petition expressing the opinion of some employees about the Union nor the proffered testimony regarding each witness's individual lack of experience with the labor consultants is probative of what happened to Aceves or Contreras. Moreover, there is no evidence that these witnesses were in a position to observe Aceves, Contreras, Ortiz, or Negroni at key moments— thus, the witnesses seemingly lacked personal knowledge from which to testify about the interactions between these individuals. Lastly, despite UNF's claims to the contrary, whether Union support was in fact chilled by an Section 8(a)(1) violation—i.e., whether the problematic conduct *in fact* coerced anyone or interfered with a campaign—is inconsequential in an 8(a)(1) case,[8] and so cannot serve as a predicate to establish the relevance of evidence. Fed. R. Evid. 401 (noting that evidence must relate to *a fact of consequence*). Thus, the ALJ did not abuse his discretion in excluding the proffered evidence.[9] *See Marathon LeTourneau Co.,* 699 F.2d at 254.

---

[8] *See, e.g., TRW-United*, 637 F.2d at 419 (discussing what threatened employees could *reasonably conclude* as the litmus test for a Section 8(a)(1) violation); *cf. Super Thrift Mkts., Inc.*, 238 NLRB at 409.

[9] UNF also raises a number of challenges to the ALJ's evidentiary findings and credibility determinations. UNF argues that there is no substantial evidence on the record to support that any of the three allegedly problematic incidents occurred at all. However, the record is almost entirely composed of testimony, and there is no question that testimonial evidence exists to support each of the ALJ's findings. Accordingly, the essence of UNF's objections as to the occurrence of certain events is that its witnesses—who deny the occurrence of those events—are more credible than the Board's witnesses, who UNF claims are unreliable. As discussed above, the ALJ's credibility determinations are binding on this court except in very rare instances. *Asarco*, 86 F.3d at 1406. Here, the ALJ's credibility findings, which were based on witness demeanor and extent of contradiction or corroboration,

No. 16-60124

## IV. Conclusion

For the aforementioned reasons, UNF West's petition is DENIED. The Board's cross-application for enforcement is GRANTED.

---

were eminently reasonable. Thus, we decline to disturb either those determinations or any factual findings based upon them. *Id.*